REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2768

September Term, 2012

_____

JAMES A. CALHOUN-EL

v.

STATE OF MARYLAND

_____

Meredith,
Graeff,
Raker, Irma S.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Graeff, J.
_____

Filed:  December 21, 2016

James A. Calhoun-El, appellant, appeals from the December 3, 2012, Order of the Circuit Court for Montgomery County, denying his Motion to Reopen Post-Conviction Relief. Appellant filed an Application for Leave to Appeal, which this Court granted on December 10, 2015.

Pursuant to this Court's Order directing the parties to brief three issues, appellant presents the following three questions:

1. In light of *Unger v. State*, 427 Md. 383 (2012), did the trial court at appellant's 1981 trial commit reversible error by instructing the jury that (1) as to the offenses with which Calhoun-El was charged, the jury was "the sole judges of the law and facts," (2) the court's instructions as to the offenses were "advisory," and (3) the jury was "not bound to follow" the instructions?

2. If the trial court committed reversible error, then in light of *Unger*, did defense counsel's failure to object to the instructions constitute a waiver?

3. If defense counsel's failure to object to the instructions did not constitute a waiver, then in light of *State v. Waine*, 444 Md. 692 (2015), did the circuit court abuse its discretion in denying Calhoun-El's motion to reopen his post-conviction proceeding and err in failing to vacate his convictions and award him a new trial?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 3, 1981, a jury in the Circuit Court for Montgomery County convicted appellant of first degree murder of a police officer, first degree murder of a civilian, and several related offenses. It subsequently sentenced appellant to death for the murder of the police officer, and the circuit court sentenced appellant to life for the murder of the civilian, and an additional eighty years, consecutive, for the remaining convictions. Appellant's

convictions were affirmed on appeal by the Court of Appeals.[1]  *Calhoun v. State*, 297 Md.

563 (1983), *cert. denied sub nom. Tichnell v. Maryland*, 466 U.S. 993 (1984).

For the purposes of this appeal, we adopt the "agreed statement of facts" set forth

by the Court of Appeals in its opinion affirming appellant's convictions:

> The W. Bell store is located at 1130 New Hampshire Avenue in White Oak, Montgomery County. Banging noises coming from the area of the Bell store were heard by a neighbor across the street at approximately 11:00 p.m. on March 26, 1981. She saw shadows in the area of the roof at the back of the store. The neighbor notified her father, who went outside their home with a flashlight to investigate. He saw people leaving. She saw a car, which looked like a hatchback, parked across the street.

> An employee of Electro Protective Corporation testified that at 6:16 a.m. on March 27, 1981, both the safe alarm and the perimeter alarm at the Bell store were activated. He notified the police; Douglas T. Cummins, Jr., Bell's assistant manager; and David W. Myers, an employee of Electro. Officer Philip Carl Metz, the police officer covering that beat on that particular day, was dispatched to the Bell store.

> Cummins testified that at approximately 6:20 or 6:25 a.m. on March 27 he received a telephone call from Electro. He arrived at the store at about 7:00 a.m. at which time he saw a white station wagon with Electro's name on the door in front of the store. He observed a late model two-door black Cadillac on the other side of the parking lot. A black male in the front seat was the sole occupant.

> The technician in the Electro vehicle identified himself to Cummins. Cummins drove around the store and noticed that the outside of the building appeared to be secure. Officer Metz arrived on the scene at about 7:15 a.m. Cummins unlocked Bell's door with a set of master keys. He, Officer Metz, and Myers entered the building. They first checked the merchandise area. Then they proceeded to the cashroom. It had two doors, both of which supposedly could be opened only from the inside. Cummins put a key into the door. Upon his opening the door Officer Metz stepped in front of him to

---

[1] Appellant's case was reviewed directly by the Court of Appeals pursuant to former Md. Code (1982 Repl. Vol), Art. 27, § 414, which provided for automatic review by the Court of Appeals in cases in which the death penalty was imposed.

enter. At that moment Cummins noticed "a shoulder and about half of a back of an individual standing to the right of the doorway." Metz was pulled into the doorway as another, shorter individual armed with a pistol jumped into the hallway area. Cummins did not see the place from which the shorter man came. Myers drew his gun and stumbled back into a hallway door when he was shot. Cummins said he realized he had been shot in the upper shoulder area of his chest. After thirty to forty-five seconds the taller man opened the door and dragged Cummins into the office. Cummins at that point observed Metz lying on the floor and bleeding from the head. Cummins said that although he saw or heard no evidence of a third person he had no idea whether there might have been other individuals there who had left through another door by the time he was dragged into the room. He asserted that the shorter man shot him and he could only assume that it was the taller person who shot Metz.

Cummins complied with the taller man's order to open a combination safe. He was then asked by that same person to open a second safe. He was hit on the left side of his head with a pistol when he reached for his wallet which contained the combination to the second safe. Cummins said that after he failed twice in his efforts to open the second safe this taller person cocked a pistol, put it to the side of Cummins' head and informed him that if he did not open the safe that time he was a dead man. He succeeded in opening the safe. He was then told to sit on the floor. His wrist was handcuffed to a file cabinet drawer. He heard his assailants scramble up through the ceiling of the office "and then back down on the other side." He pulled himself onto a chair, pulled the file drawer from the cabinet, carried the drawer by its handle to a telephone in the loading dock area, and called the police. After failing to detect a pulse from Myers' neck, he went to the door and waited for help.

Cummins testified that both of the men that he saw were wearing stocking masks which covered their entire heads. Both men wore gloves on their hands. Cummins observed gaps between the sleeve cuffs and the top of the gloves of these persons from which he determined they were black.

James Adcock testified that while working as a plumber on the fourth floor of a building next door to the Bell store, at approximately 7:00 a.m. on March 27, 1981, he looked out the window and saw two black males running across the parking lot. He said they "skipped" over a fence, jumped over a wall and went into a parked "brown or maroon-looking car" that then drove away.

Evidence to connect Calhoun with the crime included that of an accomplice who testified pursuant to a plea agreement. His testimony

-3-

included a description of an attempt by him and another to break into the Bell store through the roof shortly after midnight on the morning of this incident. They were frightened away when they noticed someone watching them with a flashlight from across the parking lot. He related how later, in the early hours of that morning, he and his associates encountered Calhoun, discussed the hole they had put in the Bell roof, and worked out a plan for entering the store. They then waited for the manager to arrive so that the robbery could be effected. He described the operation in detail including mention of weapons, a description of the stocking masks used and their source, and testimony as to the amount of money taken and its division. There was substantial other evidence adduced in addition to that of the accomplice including testimony concerning casts made of footprints found in the area. Two of these casts matched one of the shoes of the accomplice.

*Id.* at 572-74.

In 1985, after his convictions were upheld on direct appeal, appellant filed a motion for post-conviction relief, arguing, *inter alia*, that the trial court's "advisory" jury instructions during the guilt/innocence phase of the trial were improper. The post-conviction court rejected this claim, finding that the contention was waived because defense counsel failed to raise the issue at trial and on appeal.[2]

In 1989, appellant filed a "supplemental" petition for post-conviction relief, and the State conceded that appellant was entitled to a new sentencing proceeding. In 1990, after a multi-day sentencing proceeding, the jury determined that appellant should be sentenced to life, not death, for the murder of the police officer, with this sentence to be served consecutively to appellant's other sentences.

---

[2] The post-conviction court did grant appellant a new capital sentencing proceeding, but the Court of Appeals subsequently reversed this order. *See State v. Calhoun*, 306 Md. 692, 752 (1986).

Appellant subsequently filed multiple motions for collateral review. All of those motions were denied without a hearing.

The motion at issue here is the Motion to Reopen appellant's post-conviction case, which was filed on July 5, 2012. After the circuit court denied appellant's motion without a hearing, appellant filed an application for leave to appeal, which this Court granted.

## DISCUSSION

The issues in this case are all based on appellant's contention that the "trial court committed reversible error when it told the jury that its instructions on reasonable doubt, the burden of proof, and the substantive definitions of the offenses were advisory and could be disregarded." He contends that the law is clear that "jurors must be told that instructions regarding constitutional requirements and the undisputed law of the crimes alleged 'are binding on the jury and counsel as well.'" Before addressing the parties' contentions, we first will address the rather tortured path of the law in Maryland regarding "advisory" jury instructions.

## I.

### History of Advisory Instructions

Article 23 of the Declaration of Rights provides that the jury in a criminal case "shall be the Judges of the Law, as well as of fact." In 1980, the Court of Appeals addressed the propriety of "advisory rather than binding (jury) instructions" and whether such an instruction "facially deprives a defendant of the federally secured right to due process of law" under the 14th Amendment to the U.S. Constitution. *Stevenson v. State*, 289 Md. 167,

169, 172 n.2 (1980), *overruled by Unger*, 427 Md. 383 (2012). In addressing this issue, the Court stated that it first would determine what "law" the jury is entitled to "judge" under Article 23. *Id.* at 176. The Court stated that previous decisions made clear that the right of juries to decide the law was not "all-inclusive," but rather, it was much more limited in scope. *Id.* at 177. Indeed, past decisions "make it quite evident" that the jury's role in judging the law was "confined 'to resolv(ing) conflicting interpretations of the law (of the crime) and to decid(ing) whether th(at) law should be applied in dubious factual situations,' and nothing more." *Id.* at 199 (quoting *Dillon v. State*, 277 Md. 571, 581 (1976)).

> The Court ultimately held, as follows:
>
> Because of this division of the law-judging function between judge and jury, it is incumbent upon a trial judge to carefully delineate for the jury the following dichotomy: (i) that the jury, under Article 23, is the final arbiter of disputes as to the substantive "law of the crime," as well as the "legal effect of the evidence," and that any comments by the judge concerning these matters are advisory only; and (ii) that, by virtue of this same constitutional provision, all other aspects of law (e.g., the burden of proof, the requirement of unanimity, the validity of a statute) are beyond the jury's pale, and that the judge's comments on these matters are binding upon that body. In other words, the jury should not be informed that all of the court's instructions are merely advisory; rather only that portion of the charge addressed to the former areas of "law" may be regarded as non-binding by it, and it is only these aspects of "law" which counsel may dispute in their respective arguments to the jury. On the other hand, the jury should be informed that the judge's charge with regard to any other legal matter is binding and may not be disregarded by it.

*Id.* at 179-80 (footnote omitted). The dissenting opinion characterized this holding as limiting the jury's ability to disregard the law to "conflicting interpretations of the law of the crime." *Id.* at 190 (Eldridge, J., dissenting).

In *Stevenson*, the majority of the Court made clear that the issue raised on appeal did not include the propriety of the instructions given in that case, but rather, whether Article 23 violated the Constitution. *Id.* at 171-72. In light of the Court's interpretation of the jury's limited ability to be "judges of the law," the Court held that Article 23 was not unconstitutional, and it affirmed Stevenson's convictions. *Id.* at 189.[3]

Subsequently, in *Montgomery v. State*, 292 Md. 84, 86-87 (1981), *overruled by Unger v. State*, 427 Md. 417, the Court of Appeals addressed a challenge to instructions telling the jury that "anything that I . . . tell you about the law will be . . . advisory" and the jury could pay "absolutely no attention" to the instructions on the law. In finding the instructions erroneous, the Court cited its earlier decision in *Stevenson*. *Id.* at 86-87. Noting that the trial court had advised that all of its instructions were advisory, including instructions on the State's burden to prove guilt beyond a reasonable doubt, the defendant's presumption of innocence, and the right not to testify, the Court stated that such instructions "are not 'the law of the crime;' they are not advisory; and they cannot be the subject of debate by counsel before the jury. They are binding." *Id.* at 91.

The Court of Appeals in subsequent cases repeatedly has indicated that *Montgomery* merely applied the law set forth in *Stevenson*. It has characterized *Montgomery* as "reaffirm[ing]" "[t]he *Stevenson* interpretation of Article 23," *Unger v. State*, 427 Md. 383, 388 (2012), "reinforc[ing]" *Stevenson's* interpretation of Article 23, *State v. Waine*, 444

---

[3] As explained, *infra*, the Court's decision in *Stevenson v. State*, 289 Md. 167 (1980), that its interpretation of Article 23 did not set forth a new constitutional standard, was overruled by *Unger v. State*, 427 Md. 383, 417 (2012).

Md. 692, 696 (2015), and "merely serv[ing] as an example and application of *Stevenson*," *State v. Adams*, 406 Md. 240, 258-59 (2008), *overruled on other grounds by Unger*, 427 Md. 383.

In *Adams*, 406 Md. at 256-60, the Court of Appeals stated that *Stevenson's* holding that it did not make new law was not wrongfully decided, and therefore, it would not be disturbed under principles of stare decisis. The Court held, therefore, that Adams' claim regarding erroneous advisory jury instructions given at his 1979 trial was waived because he did not challenge these instructions at trial.

In *Unger*, 427 Md. at 417, the Court of Appeals reversed course, holding that portions of the *Adams* decision, i.e., the holding that the Court's interpretation of Article 23 in *Stevenson* and *Montgomery* was not a new State constitutional standard, were "wrongly decided" and overruled. The Court held that the "*Stevenson* and *Montgomery* opinions set forth a new interpretation of Article 23 and established a new state constitutional standard." *Id.* at 411.

The Court's decision in that regard was significant to the issue whether Unger had waived his right to raise the issue of improper jury instructions in post-conviction proceedings. Noting that the failure to raise an issue at trial did not constitute a waiver of the issue if the Court of Appeals' ruling changed the applicable legal standard, the Court held that "failure to object to advisory only jury instructions in criminal trials prior to *Stevenson* will not constitute a waiver." *Id.* at 390-91. Accordingly, it held that Unger's failure to object to the advisory nature of the jury instructions at trial did not constitute a

waiver of the right to challenge the instructions in Unger's subsequent post-conviction action. *Id.* at 411.

In *State v. Waine*, 444 Md. 692 (2015), the Court of Appeals again revisited the issue. In Waine's trial in 1976, the court instructed the jury as follows:

> Under the Constitution and laws of the State, the jury in a criminal case is the judge of both the law and the facts and anything I say to you about the law is advisory only. It is intended to help you, but you are at liberty to reject the Court's advice on the law and to arrive at your own independent conclusion on it, if you desire to do so.

*Id.* at 697. The court concluded its instructions with a reiteration of its opening instruction: "You are not partisans. You are judges, judges of the facts and the law. Your sole interest is to ascertain the truth from the evidence in the case." *Id.* Petitioner's counsel did not object. *Id.*

The Court of Appeals declined the State's request to overrule *Unger*, and it upheld the post-conviction court's ruling granting post-conviction relief. *Id.* at 703. It rejected the State's argument that "advisory only instructions be considered on a case by case basis to determine whether there is a 'reasonable likelihood' that the jurors understood the court's Article 23 instruction as allowing them to convict a defendant on less than proof beyond a reasonable doubt." *Id.* The Court explained its reasoning, as follows:

> The State's reliance on the 'reasonable likelihood' test is misplaced, as this was the test adopted by the Supreme Court for review of jury instructions that are ambiguous. . . .
>
> Ambiguity is not the issue in Article 23 advisory only jury instructions; rather, such instructions are clear, but erroneous, as they give the jury permission to disregard any or all of the court's instructions, including those bedrock due process instructions on the presumption of

innocence and the State's burden of proving the defendant's guilt beyond a reasonable doubt.

*Id.* at 703-04. On the facts of that case, where the advisory only instructions clearly related to the law regarding the burden of proof and other constitutional issues, the Court held that the instruction was "structural error not susceptible to harmless error analysis." *Id.* at 705. *Accord State v. Adams-Bey*, 449 Md. 690, 694 (2016) (affirming holding in *Waine* "that structural error results from the giving of advisory only instructions that include expressly or by implication the presumption of innocence and the standard of proof").

In *Adams-Bey*, 449 Md. at 694, the Court again addressed advisory instructions. It stated, optimistically, that the opinion would "put to an end finally any question surrounding such instructions and the effect that they have upon an individual's criminal trial." The Court reaffirmed its holding in *Waine*, stating: "Structural error results from the giving of advisory only instructions that include expressly or by implication the presumption of innocence and the standard of proof. Such error, upon a proper petition for postconviction relief or motion to reopen a postconviction proceeding, entitles an individual to a new trial." *Id.*

Judge Watts, in a separate opinion, explained when instructions are "advisory":

> As the Majority indicates, instructions are "advisory" where a trial court instructs the jurors that they are the judges of the law, and the trial court fails to instruct the jury that the trial court's instructions on matters other than the law of the crime, such as the State's burden of proof and the presumption of innocence, are binding—*i.e.*, not advisory. Thus, for example, in my view, where a trial court instructs a jury that the trial court's instructions on the law of the crime are "advisory only," but that all of the trial court's other instructions are binding, such instructions would not be deemed "advisory instructions" of the type that *Unger* proscribes.

*Id.* at 711 (Watts, J., joining in judgment only).

With that background in mind, we address the issues presented in this case.

## II.

### Instructions Below

The trial in this case occurred after *Stevenson*, but prior to *Montgomery*. Thus, pursuant to the law set forth in *Stevenson*, unlike in the previous cases discussed, the trial court distinguished between instructions relating to constitutional principles and "the law of the crime."

Shortly before opening statements, the court provided the jury the following preliminary instructions:

> They [sic] are **certain Constitutional rights of which a Defendant in any case is afforded. When I give you the instructions on those, you are bound by those instructions and must follow them**. With the offenses themselves, that is the charges, and again, I don't intend to go through all of them nor all of the elements. They will be covered at the conclusion of the trial.
>
> When it comes to the instructions with respect to the specific offenses, what I say to you then about the law is merely advisory and you are not bound to follow it.
>
> Counsel are free to give to you their interpretation of the law. You ladies and gentlemen then must to that extent be the judges of the law and the facts as they apply to the specific offenses.
>
> With respect to the facts and testimony and evidence, you are the sole judges of those facts. If there [are] any inconsistencies in the facts, you must listen and determine wherein the truth lies.

(emphasis added).

At the conclusion of trial, the court gave the jury its final instructions. It stated, in pertinent part, as follows:

> **There are certain constitutional rights which I indicated not only at the beginning of the trial, but also it may be repetitious, but nonetheless on certain constitutional aspects of the instructions, you are bound by those instructions and must follow them, whether you agree or disagree with them**. It is under your oath, you have all sworn to fairly and impartially decide this case and apply the facts under the law as I give it to you.
>
> Now, I said **with respect to certain constitutional aspects or rights, those instructions are binding**. I will get to some other instructions with respect to the actual law of the offenses.
>
> In Maryland -- I will again repeat that -- in Maryland you will be the judges of both the law and the facts. And I'll attempt to try to make that clear when I get there. First, let me say the order in which I give my instructions, the manner in which I give the instructions are not designed to emphasize any instruction or place greater importance. I would ask that you consider all of the instructions that are given to you.

(emphasis added).

The court then instructed the jury on the constitutional rights that it had referred to, including the State's burden of proof beyond a reasonable doubt, and the defendant's right to remain silent. The court then stated:

> Now, as I come to the instructions, as I said, **you are bound to all the constitutional instructions that I have given**, to [appellant] in this case. As to the instructions **as I now get into the offenses themselves**, and your function, as I said, **you become the sole judges of the law and the facts**. **My instructions become advisory** and you are not bound to follow them. Indeed, if you disagree, you may disregard entirely what I say. This doesn't mean that you ought to arbitrarily interpret the law so as to make it conform to the law that you would like to have or that you ignore clearly the existing law. Rather, you could resolve conflicting interpretations of the law and decide what law should be applied to the facts as you ladies and gentlemen determine them. As the judges of the facts, you are the sole judges of the credibility of any witness and, indeed, all of the witnesses.

-12-

In determining whether or not the State has established the charge or charges against the defendant beyond a reasonable doubt, you must consider and weigh the testimony of each of those witnesses. And you alone determine whether to believe any witnesses and to what extent any witness should be believed. If there is any conflict in the testimony, it's your function to resolve the conflict and to determine where the truth lies.

* * *

Now, you must make some determination of guilt or innocence. And as I said, if you are satisfied beyond a reasonable doubt of the guilt of the defendant, you will make a determination on each of the nine counts.

(emphasis added).[4] Appellant concedes that his attorney did not object to these instructions.

Appellant contends that the court erred in its instructions to the jury. We need not address whether the circuit court's jury instructions were improper in light of *Stevenson*, *Montgomery*, *Adams*, *Unger*, and *Waine*, because, as we explain below, we conclude as a threshold matter that appellant's claims were waived.[5]

---

[4] During its discussion on the specific charges, the court stated several times that the State's burden of proof was beyond a reasonable doubt. For example, in instructing on the charge of first degree murder, the court stated: "The burden is on the State to prove to you beyond a reasonable doubt every element of the offense as just described to you. Namely, a killing, premeditated and with malice aforethought, as these terms have been defined."

[5] We do note, however, that although the instructions given here were not a model of clarity, the court clearly informed the jury that it would provide two sets of instructions, the first set being binding instructions on constitutional principles. When it finished instructing the jury on those principles, and it came to the section regarding the specific offenses, the court reiterated that the instructions that had just been given were binding constitutional instructions. It then explained that the next instructions, which were "advisory," related to the "offenses themselves."

### III.

### Waiver and Plain Error

Pursuant to the Maryland Uniform Postconviction Procedure Act, "an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation . . . at trial." Md. Code (2008 Repl. Vol.) § 7-106(b)(1)(i) of the Criminal Procedure Article ("CP"). Where a petitioner could have objected, but failed to do so, "there is a rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation." CP § 7-106(b)(2). The waiver provision requiring an affirmative waiver from the defendant, however, applies only to fundamental rights. *Adams*, 406 Md. at 262-63. "An erroneous jury instruction, even on reasonable doubt, is not such a fundamental right requiring an affirmative 'knowing and intelligent' waiver." *Id.* at 263. Thus, the mere failure to object to a jury instruction constitutes a waiver. *Id.* at 263-66.

Here, appellant concedes that he did not object at trial to the trial court's instructions. He argues, however, that pursuant to *Unger*, his claim is not waived.

The wrinkle in this case is the timing of appellant's trial. Unlike *Unger* and the other cases discussed, which involved trials that took place prior to the decisions in **both** *Stevenson* and *Montgomery*, appellant's trial took place post-*Stevenson* and pre-*Montgomery*.

Appellant argues that, because his trial took place prior to the decision in *Montgomery*, his failure to object should not constitute a waiver. He asserts that, in

*Stevenson*, the Court of Appeals "began to reshape Maryland law regarding the proper interpretation of Article 23," and although the Court's language in *Stevenson* "signaled a change, the direction was not clear." He contends that the legal principles regarding "advisory" jury instructions "did not take form until *Montgomery*," that "Maryland courts, and the Court of Appeals in particular, treat *Stevenson* and *Montgomery* as a unit," and that "case law makes clear that, while *Stevenson* and *Montgomery* are companions," it was *Montgomery* that "established the legal standard." He argues that *Stevenson* and *Montgomery* should be treated as "a single, unified . . . doctrine," and because his trial was held during the "gestational" period between the two cases, that is, after *Stevenson* but before *Montgomery*, "his attorney's failure to object" to the court's instructions "did not constitute a waiver."

We are not persuaded. As our discussion of the history of advisory instructions makes clear, the Court's interpretation of Article 23 originated in the *Stevenson* opinion. *See Unger*, 427 Md. at 388 ("[T]he *Stevenson* opinion construed Article 23 as limiting the jury's role of deciding the law to non-constitutional 'disputes as to the substantive law of the crime, as well as the legal effect of the evidence.'") (quoting *Stevenson*, 289 Md. at 180) (internal quotation marks omitted). Specifically, the *Stevenson* Court stated:

> [I]t is incumbent upon a trial judge to carefully delineate for the jury the following dichotomy: (i) that the jury, under Article 23**,** is the **final arbiter of <u>disputes</u> as to the substantive "law of the crime,"** as well as the "legal effect of the evidence," and that any comments by the judge concerning these matters are advisory only; and (ii) that, by virtue of this same constitutional provision, **all other aspects of law (e.g., the burden of proof, the requirement of unanimity, the validity of a statute) are beyond the jury's**

-15-

**pale**, and that the judge's comments on these matters are binding upon that body.

289 Md. at 180 (emphasis added).

As the Court of Appeals subsequently explained, *Montgomery* merely "reaffirmed" the "*Stevenson* interpretation of Article 23," *Unger*, 427 Md. at 388, and "reinforced" the "*Stevenson* interpretation of Article 23," *Waine*, 444 Md. at 696. Indeed, in *Adams-Bey*, 449 Md. at 695, the Court stated that "the constitutional standard set forth in *Stevenson*— that the jury is the judge of the law of the crime and the judge's remaining instructions on the law are binding—was a change in the law that must be applied retroactively." Similarly, in *Unger*, 427 Md. at 390-91, the Court deemed the decision in *Stevenson* as the relevant time-period for the waiver analysis, holding that "failure to object to advisory only instructions in criminal trials prior to *Stevenson* will not constitute a waiver."

Here, appellant's trial took place after *Stevenson*. Accordingly, general waiver principles apply. *See State v. Bowman*, 450 Md. 40, 41 (2016), (remanding case to the circuit court to determine whether "Respondent waived any claim under *Unger* . . . , given that Respondent's trial occurred after this Court issued its opinion in *Stevenson*"). And because there is no dispute that appellant's attorney did not object to the trial court's jury instructions, his claim of error in this regard has been waived.

Appellant argues, however, that even if we determine that his claims of error in the instructions were waived, "the errors here are plain error and require reversal." He cites the multi-factor test set forth in *Savoy v. State*, 420 Md. 232, 243 (2011), and he asserts that these "factors all point in favor of finding plain error in [his] case."

The Maryland appellate courts, however, have made clear that the plain error doctrine does not apply in post-conviction proceedings.  In *Cirincione v. State*, 119 Md. App. 471, 512-13, *cert. denied*, 350 Md. 275 (1998), we explained:

> We are called upon to employ our extraordinary power of plain error review in order to rescue appellant from his waiver. Precedent dictates, however, that plain error review is a creature of direct appellate review only and is not available in post conviction proceedings. *Prokopis v. State,* 49 Md. App. 531, 534 (1981) (denying application for leave to appeal); *see also Walker v. State,* 343 Md. 629, 635 (1996). Neither the Post Conviction Procedure Act nor the Maryland Rules of Post Conviction Procedure contain any provision for plain error exceptions to waivers. Appellant invokes Maryland Rule 8-131 as the source of the rule (although perhaps Rule 4-325(e) is the stronger cite), but as the Court of Appeals noted in *Walker,* "Rules 4-325(e) and 8-131(a), authorizing a court to take cognizance of 'plain error' despite the waiver issue, literally apply only to direct appellate review of a judgment." 343 Md. at 647. Appellant cannot use post conviction review in such a manner so as to secure a second round of direct appellate review. *See Kelly v. Warden, Maryland Penitentiary,* 243 Md. 717, 718 (1966) ("The Post Conviction Procedure [Act] . . . is not a substitute for an appeal or a means of obtaining a belated appeal.").

(footnotes and parallel citations omitted).  *Accord Adams*, 406 Md. at 285 ("'[P]lain error' review under the Maryland Rules is not applicable in post-conviction proceedings.").

The Court in *Adams*, 406 Md. at 269, did note that, under some circumstances, pursuant to Rule 8-131(a), we "possess[] discretion to excuse a waiver" in a post-conviction proceeding.[6]  *See also Unger*, 427 Md. at 426 (Harrell, J., concurring and

---

[6] The Court stated that "revisiting the evolution and basis of this discretion might be a principled undertaking," but it would "save that endeavor for another day, if at all." *State v. Adams*, 406 Md. 240, 270-71 (2009), *overruled on other grounds by Unger*, 427 Md. 383.

dissenting). The Court, however, declined to exercise its discretion to excuse Adams'

waiver in that case, and we shall do the same here.

We decline to exercise our discretion to excuse appellant's waiver for several

reasons. First, *Stevenson* had been decided at the time of appellant's trial, and therefore,

there existed a reasonable basis for appellant to object at trial to the alleged advisory nature

of the instructions. Second, exercising our discretion to excuse the waiver, and potentially

reverse a conviction more than 35 years after a crime, would present the potential for unfair

prejudice to the State. *See Cave v. Elliott*, 190 Md. App. 65, 84 (2010) (in deciding whether

to exercise discretion pursuant to Rule 8-131(a), court looks to "whether the exercise of its

discretion will work unfair prejudice to either of the parties") (quoting *Jones v. State*, 379

Md. 704, 714 (2004)). Third, the extensive litigation that already has occurred regarding

"advisory" jury instructions weighs against exercising our discretion to review this

unpreserved issue.

For these reasons, we decline to exercise our discretion to excuse appellant's waiver

of the right to contest the jury instructions. Accordingly, we affirm the decision of the

circuit court to deny appellant's Motion to Reopen Post-Conviction Relief.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**